## Matter of the alleged lunacy of MARY ANN LINDSLEY.

1. Eleven days prior to taking an inquisition in lunacy, a constable attempted to serve a written notice thereof upon the alleged lunatic at the house of her brother, where she lived. The brother refused to admit the constable, and thereupon that officer served the notice upon the brother, and upon the same day served a similar notice upon the attorney who had represented the alleged lunatic in similar proceedings which had theretofore been had. At the taking of the inquisition, the attorney thus served appeared in behalf of the alleged lunatic, and examined and cross-examined witnesses for her without objecting that she had not been properly notified.—*Held*, that in the absence of proof that the alleged lunatic did not have notice of the inquisition and suffer prejudice for that reason, the inquisition will not be set aside for want of notice.

2. The unanimous verdict of a jury of twelve men upon a lunacy inquest, although, agreeably to the provisions of the act of March 23d, 1887 (*P. L. of 1887 p. 248*), only twelve jurors be summoned, is sufficient.

3. Where it appears that one of the jurors at an inquisition in lunacy sat, two and a half years before, upon a similar inquisition touching the lunacy of the same person, and that the attorney who represented the alleged lunatic in the second proceeding also represented her in the former proceeding, and that he not only suffered the juror to be sworn without objection, but, also, during the trial, questioned him as to his connection with the former inquest, and then proceeded in the trial without objection, and that no actual bias or misconduct is imputable to the juror, the inquisition will not be set aside because of the previous service of that juror.

4. At a personal examination of an alleged lunatic by the commissioners and jurors, all other persons, including counsel, may be excluded, so that the commissioners and jurors may be at liberty to exercise their own observations.

5. A traverse of an inquisition by an alleged lunatic cannot be demanded as a right in this state, but can be had only upon the exercise of sound judicial discretion by the court.

Lindsley's Case.

6. It is proper, when motion is made for leave to traverse an inquisition in lunacy, for the chancellor to privately examine the alleged lunatic, and thereby ascertain if he or she deliberately and understandingly desires the privilege asked for.

On petition to set aside inquisition, and for leave to traverse.

*Mr. Henry S. Harris*, for the petition.

*Mr. Howard W. Hayes* and *Mr. George H. Lambert, contra.*

THE CHANCELLOR.

The first commission in the nature of a writ *de lunatico inquirendo* was issued in this matter in 1885, and returned in July of that year, the return being, that at the time of taking the inquisition Mrs. Lindsley was of unsound mind, and totally incapable of transacting her own business affairs; that she did not enjoy lucid intervals, and that she had been in the same state of lunacy for three years and upwards. Afterwards, upon the petition of Mrs. Lindsley, the inquisition thus returned was set aside, because the chancellor was in doubt, in point of fact, as to the correctness of the return, and a new inquisition was awarded, which was executed and returned in the summer of 1887, the return to it being, that Mrs. Lindsley's mind was impaired by age and other causes, and that she was not capable of managing her own affairs. Nine jurors found that this condition had existed since October, 1883, while three considered that it dated from October, 1885. Upon motion, the chancellor set this inquisition aside, because the return did not show that Mrs. Lindsley's incapacity resulted from the impairment of her mind, and, upon appeal, the court of errors and appeals affirmed his order without passing upon the point decided by him, putting its decision upon the ground that the return did not state that Mrs. Lindsley was incapable of governing herself. In 1889, still another commission was issued, which was returned in December of that year, the return being, that Mrs. Lindsley is of unsound mind, so that she is not fit for the government of herself, her lands and tenements, and that she has been of such unsound mind since October, 1883.

The present petition advances several reasons for setting aside this last inquisition. The first urged is, that Mrs. Lindsley did not have notice of the execution of the commission. She was entitled to reasonable notice of the time and place of taking the inquisition. *Matter of Whitenack, 2 Gr. Ch. 252; Matter of Vanauken, 2 Stock. 186.* The rules of this court require that such notice shall be ten days, unless, for special reasons, the chancellor shall order otherwise. *Rule 172.* The proofs disclose that Mrs. Lindsley, since 1883, has been at the house of her brother, Paul Fairclo, at Belvidere, in the county of Warren. She there lives with him and her daughter-in-law, Frances Lindsley, who both have taken an active part in resisting the several inquisitions that have been had concerning Mrs. Lindsley's condition.

Eleven days before the day appointed for taking the inquisition, a constable of the county of Warren, to whom duplicate notices of the taking of the inquisition, unobjectionable in form and substance, were delivered, called at Mr. Fairclo's residence and requested Mr. Fairclo to allow him to see Mrs. Lindsley. He did not disclose the object of his call and was refused admission, and thereupon he served one of the notices upon Fairclo. Then, the same day, he found Henry S. Harris, a lawyer of this state, who had appeared in behalf of Mrs. Lindsley at all the previous inquests and in all proceedings concerning them, and served the other notice upon him. Subsequently Mr. Harris appeared for Mrs. Lindsley at the inquisition, without objecting that she had not had proper notice of it, and in her behalf cross-examined witnesses produced for the petitioner, and, himself, produced and examined witnesses for Mrs. Lindsley. It is not now intimated that Mrs. Lindsley did not receive one or both of the notices which were served as has been stated, or that she did not have ample time to prepare for the trial of the issue which the commission presented, or that Mr. Harris did not have authority to appear for her. Whatever strength the objection has, rests wholly on the fact that it has not been affirmatively shown that either of the notices served reached Mrs. Lindsley. Under these circumstances, the appearance of counsel

without protest, and the failure to show that the notice was not received, and that prejudice has, for that reason, been suffered, are fatal to this objection.

It is next urged, that the sheriff, in virtue of the precept issued to him by the commissioners, in accordance with the provisions of the act concerning idiots, lunatics, habitual drunkards &c., approved March 23d, 1887 (*P. L. of 1887 p. 48*), summoned twelve jurors to serve at the inquisition instead of twenty-four, and that by means thereof the petitioner was deprived of such a trial by jury as would have been had at the adoption of the constitution of this state. The insistment is, that the act of 1887 is in contravention of that part of Article I., Section 7, of the constitution, which provides that "the right to trial by jury shall remain inviolate."

It is not necessary to the disposition of the question here suggested that I should consider whether an inquest of this character is such a trial by jury as the constitution contemplates. Twelve jurors have unanimously concurred on the verdict rendered. At the adoption of the constitution it was the practice to summon at least twelve and not more than twenty-four jurors to serve at lunacy inquisitions. No inquisition could be taken upon the oaths of less than twelve jurors. *1 Hen. VIII. c. 7; Coll. Lun. 130; Shelf. Lun. 90; Bush. Insan. § 63.* If twelve concurred in a verdict, it was good, although the remainder of the jurors summoned refused to assent to it. *Coll. Lun. 130.* The right, then, which was assured to the alleged lunatic was the concurrence of twelve, out of an uncertain number of, jurors against him. This right is maintained by the act of 1878. I do not think that this objection is well taken.

It is next objected, that one of the jurors who returned the verdict against Mrs. Lindsley sat upon a former trial of the very issue which was presented under the last commission.

The fact is, that the juror in question served in the inquisition of 1887, and then joined in the verdict that Mrs. Lindsley's mind was impaired by age and other causes, and that she was not then capable of managing her own affairs, and that that

condition of mind had existed since October, 1883. The issue-presented was, whether Mrs. Lindsley, at that time, was a lunatic or of unsound mind, so that she was not fit for the government of herself, her lands &c., and, if so, from what time &c. The issue presented by the commission of 1889 was as to similar conditions two years and a half later. The only point upon which the inquiries of both commissions were identical, was that which related to the time when the mental condition found commenced.

When the jury was empaneled Mrs. Lindsley was represented by the same counsel who had acted in her behalf at the trial in 1887. He failed to object to the swearing of the juror, but during the course of the trial questioned him as to his connection with the former inquest, and although the juror admitted that connection, made no objection to the continuance of the case before him, but without further remark permitted the trial to be concluded and a verdict to be rendered. It is manifest, that ordinary precaution and diligence at the swearing of the jury would have disclosed this juror's connection with the former inquest. Not only is the lack of such precaution and diligence fatal to the present objection (*Hill. New Tr. 83 ; Thomp. & M. Jur. 344*), but counsel's acquiescence in the continuance of the trial after the juror, in response to his questions, had proclaimed his part in the former trial, must effectually preclude it. It would be against all rule to now entertain a complaint on this score. And it is not a hardship to the petitioner to refuse to entertain it, for the inquiry which is most important to her is as to her *present* condition—whether at this time it is of such a character as to justify the consignment of her property and person to the keeping of another, and that inquiry was not presented to the juror two years and a half ago. The juror is not charged with actual bias, and no misconduct is imputed to him. I fail to perceive any sufficient reason for sustaining this objection.

It is yet further objected, that the commissioners and jurors examined Mrs. Lindsley personally, and that, when they did so, they excluded her counsel from their examination.

It appears that the counsel engaged in the prosecution of the inquisition requested permission to be present at the examination, and that the commissioners informed him that, as they understood the law, all persons were to be excluded but the commissioners and jurors, but that if counsel on both sides would consent to the presence of counsel, they might attend the examination. Counsel who made the request then offered to agree with the counsel of Mrs. Lindsley, but Mrs. Lindsley's counsel refused to consent to anything, and thereupon the examination was had by the commissioners and jurors alone.

It does not appear that the counsel for Mrs. Lindsley claimed a right to attend the examination. He evidently accepted the reply of the commissioners to the counsel for the petitioner as conclusive upon him without making a request on his part. He, then, was not denied admission. Besides, he could not really have desired to be present at the examination, or he would have accepted the proposition made by the lawyer opposed to him. He does not now intimate that the right he claims did not equally belong to the counsel upon the other side. Assuming that he had the right to be present, I fail to perceive how the situation in which he was placed by the ruling of the commissioners, connected, as it was, with the offer of the petitioner's counsel, could have been substantially injurious. But he did not have the right he claims. In the *Matter of J. B.*, 1 *Myl. & C. 538, 542*, Lord Cottenham remarked, "But with what view I would ask are the jury permitted to see and examine the individual at all? Surely it must be for the purpose of assisting them in forming an opinion of his state of mind; and if so, it must be assumed that they are at liberty to exercise their own observations and make their own inference from the result of their observation." This quotation is a fair statement of the reason for the practice, which is stated in *Shelf. Lun. 121* to be, that "the lunatic ought also to be examined by the master in lunacy or jury, *all other persons being absent.*"

This concludes the reasons which were urged at the argument for setting aside the inquisition.

In addition to them, Mrs. Lindsley's counsel insisted that, as a matter of right, his client could traverse the inquisition.

Prior to the *Stat. 2 Edw. VI. c. 8*, the granting of permission to traverse appears to have been within the chancellor's discretion. That statute provides that

"If any person be or shall be untruly founden lunatic" &c., "be it enacted that every person and persons grieved, or to be grieved, by any office or inquisition, shall and may have his or their traverse to the same immediately or after his or their pleasure and proceed to trial therein, and have like remedy and advantage as in other cases of traverse upon untrue inquisitions or offices founden."

Upon the construction of this statute the authorities in England are conflicting, and for a long time the interpretation of the act was in doubt, but now it seems to be there settled that the statute makes a traverse of the inquisition a matter of right.

In *Ex parte Roberts, 3 Atk. 5, 308*, and in *Barnsley's Case, 3 Atk. 184*, Lord Hardwicke held the permission to traverse to be a matter within the chancellor's discretion, and in the *Matter of Fust, 1 Cox Ch. 418*, Lord Thurlow followed Lord Hardwicke. Later, in *Ferne's Case, 5 Ves. 832*, and in *Ex parte Wragg, 5 Ves. 450*, Lord Rosslyn held that the traverse was a matter of right. In *Ward's Case, 5 Ves. 670; Ex parte Hall, 7 Ves. 260*, and *Sherwood's Case, 19 Ves. 280*, Lord Eldon entertained the same opinion as Lord Rosslyn, and still later, in the *Matter of Bridge, Cr. & Ph. 338*, Lord Cottenham, after reviewing the previous cases, considered himself bound by the latest decisions, because they had been considered and decided in view of those which had preceded them. And still later, *In re Cumming, 1 DeG., M. & G. 537*, the question was considered as settled by the cases last mentioned. The statute of Edward II. never has become a part of the law of this state. *Den. v. Clark, 5 Halst. 258; Covenhoven's Case, Sax. 19, 21*. In the case of Covenhoven, Chancellor Vroom (*p. 20*) says: "The only question that remains is, whether Peter Covenhoven shall be allowed to traverse the inquisition. This must depend upon the sound discretion of the court, under all the circumstances."

In the *Matter of Whitenack, 2 Gr. Ch. 252*, the master (Drake), who sat for the chancellor, suggested the present inquiry without solving it.

In the *Matter of Vanauken, 2 Stock. 194*, Chancellor William-- son said : "The petitioner further asks that he may be permitted to traverse the inquisition, and this is the only question remain-- ing to be disposed of. It is addressed to the sound discretion of the court; and if, upon reviewing the case as it is before me, a reasonable doubt is raised as to the petitioner being a lunatic, the- traverse should be allowed."

These expressions of Chancellors Vroom and Williamson state the rule which has been uniformly followed hitherto in this- court to be, that permission to the alleged lunatic to traverse can-- not be demanded as a right, but can only be had upon the exer- cise of sound judicial discretion by the court; and by the action of the court of errors and appeals, in the *Matter of James, 9 Stew. Eq. 547*, such rule has had practical recognition in that tri-- bunal.

My consideration of the questions above stated and determined' has been based upon selected parts of the testimony taken at the- inquest, supplemented by *ex parte* affidavits, with the understand- ing that those questions should be first settled, and that then, if my conclusions should be adverse to Mrs. Lindsley, the remainder of the testimony should be written out from stenographic notes, and used, upon a motion for leave to traverse, in questioning the propriety of the verdict. This course was adopted, so that if the inquest should be set aside for the reasons first presented, the considerable expense of obtaining a copy of the entire evidence might be avoided. When my conclusion upon the points which had been argued was made known, it was represented that the cost of procuring a copy of the testimony would be nearly $1,000, the trial having lasted nine days, and counsel for Mrs. Lindsley considerately submitted to me the question, whether he would be justified in putting his client's estate to that expense. The utmost that he expected to accomplish by the production of the testimony was to create such a doubt in my mind as to the mental condition of Mrs. Lindsley that I would be induced to,

:allow a traverse of the inquisition. In view of the fact that three costly inquisitions have already been had in this matter, in each of which Mrs. Lindsley has been found by commissioners and a jury to labor under mental disability, I concluded that I should not encourage further litigation, unless, upon a private examination of Mrs. Lindsley, I should find that she under-standingly desired to traverse the inquisition. Upon inquiry, I found that she was unable to attend upon me, and I therefore appointed Mr. Washington B. Williams, a discreet and impartial master of this court, to repair to the house of Paul Fairclo and there conduct the examination of Mrs. Lindsley in my stead. He has reported to me that, in his judgment, she is not competent to exercise an act of volition. In the *Matter of Bridge*, above cited, Lord Cottenham, holding, as has been stated, that an alleged lunatic might of right traverse the inquisition, exam-ined him personally to see if he possessed the ability to demand that right, and found that he was, to use the chancellor's language, "deliberately anxious to have the question investigated again;" and in *Sherwood* v. *Sanderson, 19 Ves. 283*, Lord Eldon pri-vately examined an alleged lunatic, as he says, "merely to satisfy me that it is the wish of the party to exercise the right to traverse, which, as Lord Loughborough observes, in *Ex parte Feme*, I cannot refuse;" and in the *Matter of Cumming, 1 DeG., M. & G. 537, 554*, a similar examination was made. The object of the personal inquiries by the chancellors, in these cases, was to guard against an unwarrantable use of the name of the alleged lunatic to prolong litigation where traverse was a matter of right. With the same object in view, a similar examination is equally justi-fiable where leave to traverse may, in the discretion of the court, be granted. It would be a work of supererogation to allow one to traverse who is incapable of understanding or desiring the privilege that is accorded to him. The traverse, if allowed, would not be his act, but would be the act of those by whom he is surrounded and against whom he may need protection. Chan-cellor Williamson, in *Vanauken's Case*, said: "I am willing, under all the circumstances of this case, to afford a further opportunity for investigation if the petitioner is really desirous

·of a traverse, and has mind' enough understandingly to make such a request of the court. This petition is signed by Daniel Vanauken, but it is not sworn to by him. I think it is proper that such a petition should not be under oath. But the court should be satisfied that it is, in truth, the petition of the alleged lunatic. He should be capable of understanding the nature and ·object of the petition."

I think that counsel should not procure a copy of the testimony. This litigation should end here. Both the motion to ·set aside the inquisition and the motion for leave to traverse it, ·will be denied.